## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MARK LIPCHITZ, derivatively on behalf of NVIDIA CORPORATION,<br><br>     Plaintiff,<br><br>  v.<br><br>JEN-HSUN HUANG, COLETTE M. KRESS, ROBERT K. BURGESS, TENCH COXE, PERSIS S. DRELL, JAMES A. GAITHER, DAWN HUDSON, HARVEY C. JONES, MICHAEL G. MCCAFFERY, MARK L. PERRY, A. BROOKE SEAWELL, and MARK A. STEVENS,<br><br>     Defendants,<br><br>  and<br><br>NVIDIA CORPORATION,<br><br>     Nominal Defendant. | Case No.:_____<br><br><br>**DEMAND FOR JURY TRIAL** |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiff Mark Lipchitz ("Plaintiff"), by and through his attorneys, submit this Verified Stockholder Derivative Complaint against the Individual Defendants (as defined herein) and allege the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, among other things, their counsel's investigation, which includes without limitation:  (a) review and analysis of regulatory filings made by NVIDIA Corporation ("NVIDIA" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by NVIDIA; (c) review of a purported securities class action lawsuit filed in the United Stated District Court for the Northern District of California against NVIDIA and defendants Jen-Hsun Huang ("Huang") and Colette M. Kress ("Kress"), captioned *In re NVIDIA Corporation Securities Litigation*, Case No. 18cv7669 (the "Securities Class Action"); and (d) review of other publicly available information concerning NVIDIA.

## NATURE OF THE ACTION

1.      This is a stockholder derivative action asserting claims for breach of fiduciary duty, insider selling and misappropriation of information, waste of corporate assets, and violations of Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") brought on behalf of nominal defendant NVIDIA against certain officers and members of the Company's Board of Directors (the "Board").

2.      NVIDIA is a technology company specializing in the design of graphics processing units (GPUs) for the gaming and professional markets, as well as system on a chip units (SoCs) for the mobile computing and automotive market.  Since 2014, NVIDIA has shifted to become a platform company focused on four markets – gaming, professional visualization, data centers, and auto.

1

3.      NVIDIA's GPU business targets specialized markets including gamers, designers, artificial intelligence scientists and researchers, and cloud-based visual computing users.  The Company also provides specific GPUs to the cryptocurrency market for cryptocurrency mining ("cryptomining").

4.      From August 10, 2017 until November 15, 2018 (the "Relevant Period"), the Individual Defendants made and/or caused the Company to make false and misleading statements indicating that volatility in the cryptocurrency market would not affect the Company's financial results due to computer gaming customer demand, which remained strong and the main driver of NVIDIA's revenues.

5.      The Individual Defendants further made and/or caused the Company to make false and misleading statements that the Company was able to successfully manage its inventory channel and that its focus and growth were connected little, if at all, to customers purchasing its GPUs for cryptocurrency related purposes, in effect downplaying any significance cryptomining had on the Company's record revenues.

6.      In response to the positive nature of the false and misleading statements disseminated during the Relevant Period, NVIDIA's stock price soared to record highs. Meanwhile, many of the Individual Defendants were selling large quantities of their own NVIDIA shares at artificially inflated prices, collecting millions of dollars in illicit proceeds.

7.      On November 15, 2018, at the direction of the Individual Defendants, NVIDIA revealed in a press release stating that it expected its revenue to drop dramatically for its fourth fiscal quarter ending January 27, 2019.  This was markedly different from the growth that the Individual Defendants led investors to expect from the Company during the Relevant Period.

NVIDIA attributed the poor financial results to an oversupply of midrange GPUs that had built up before a rapid decline in the demand for GPUs for cryptocurrency mining.

8.     On this news, the price per share of NVIDIA stock dropped 29% over the next two trading sessions.  The share price dropped almost 19%, or $37.96, from the previous trading day's closing price, closing at $164.43 on November 16, 2018.  The price of the Company's shares continued to drop over the next trading session, losing over 11% of their value, or $19.73, by the end of the next trading day, closing at $144.70 on November 19, 2018.  The price of NVIDIA stock has continued to plummet since the revelations about the Individual Defendants' false and misleading statements.

9.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making, and/or causing the Company to make, a series of materially false and misleading statements regarding the Company's business, operations, and prospects.  Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that:  (1) NVIDIA's GPU sales growth was significantly affected by the demand for GPUs for use in cryptocurrency related activities; (2) the Company had not mastered its inventory channel; (3) the Company was unable to adapt to the volatility of the cryptocurrency market; (4) while the price of cryptocurrencies fell, the Company continued to inject mid-range GPUs into the inventory channel, disguising stagnating cryptomining-related growth; (5) the increased supply of midrange GPUs to the inventory channel would foreseeably lead to 3 months of oversupply in the channel; and (6) the Company failed to maintain internal controls.

10.     Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties and violated 10(b) of the Exchange Act by causing the Company to repurchase its

own stock at prices that were artificially inflated due to the foregoing misrepresentations. Approximately 4.8 million shares of the Company's common stock were repurchased at inflated prices ranging from an average price of approximately $180.56 per share to an average price of approximately $266.07 per share between August 28, 2017 and October 28, 2018.  As the Company's stock was actually only worth $144.70 per share, the price at which it was trading on November 19, 2018, the Company overpaid for its repurchased shares by approximately $404.3 million in total.

11.    Further, defendants Huang, Kress, Tench Coxe ("Coxe"), Persis S. Drell ("Drell"), James C. Gaither ("Gaither"), Dawn Hudson ("Hudson"), Harvey C. Jones ("Jones"), Mark L. Perry ("Perry"), A. Brooke Seawall ("Seawall") and Mark A. Stevens ("Stevens") (collectively, the "Insider Selling Defendants") breached their fiduciary duties of loyalty and good faith by selling shares of Company stock while in possession of material adverse non-public information.

12.    As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other misconduct, NVIDIA has sustained damages as more fully described below.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n, Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

14.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

17.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

18.     Venue is proper in this District because NVIDIA and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

19.     Plaintiff is a stockholder of NVIDIA, was a stockholder of NVIDIA at the time of the wrongdoing alleged herein, and has been a stockholder of NVIDIA continuously since that time.

20.     Nominal Defendant NVIDIA is a Delaware corporation with its principal executive offices located at 2788 San Tomas Expressway, Santa Clara, CA, 95051.  NVIDIA's shares trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "NVDA."

21.     Defendant Huang co-founded NVIDIA and has served as the Company's President and CEO, and as a Company director, since 1993.  According to the Company's Schedule 14A filed with the SEC on April 12, 2019 (the "2019 Proxy Statement"), Defendant Huang beneficially owned 23,462,362 shares of the Company's common stock, which represented 3.87% of the Company's outstanding shares of common stock on that date.  For the fiscal years 2017, 2018, and 2019, Defendant Huang received $12,190,238, $12,993,532, and $13,642,838, respectively, in compensation from the Company.

22.     During the period of time when the Individual Defendants materially misstated information to the investing public to keep NVIDIA's stock price inflated, and before the scheme was exposed, Defendant Huang made the following sale of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| September 6, 2017 | 110,000 | $   166.08 | $   18,268,800 |

His insider sale was made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme and allowed him to financially benefit from the scheme.

23.     Defendant Kress has served as NVIDIA's Executive Vice President and CFO since September 2013.  According to the 2019 Proxy Statement, Defendant Kress beneficially owned 165,234 shares of the Company's common stock.  For the fiscal years 2017, 2018, and 2019, Defendant Kress received $4,623,665, $4,833,715, and $4,975,388, respectively, in compensation from the Company.

24.     During the period of time when the Individual Defendants materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Kress made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| October 9, 2017 | 22,808 | $   185.31 | $   4,226,550 |
| December 14, 2017 | 171 | $   185.57 | $   31,732 |
| June 21, 2018 | 889 | $   257.64 | $   229,041 |
| September 20, 2018 | 11,576 | $   266.31 | $   3,082,804 |

Therefore, in total, before the fraud was exposed, Defendant Kress sold 35,444 Company shares on inside information, for which she received approximately $7.6 million. Her insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme and allowed her to financially benefit from the scheme.

25.     Defendant Robert K. Burgess ("Burgess") has served as a Company director since 2011. He also serves as Chair of the Compensation Committee. Apart from Nvidia, Burgess has worked at Macromedia, Inc. and Silicon Graphics, Inc. during which time he with a prominent partner at Sutter Hill Ventures, a technology-focused investment firm where fellow Defendants Coxe and Gaither have long served as managing directors. According to the 2019 Proxy Statement, Defendant Burgess beneficially owned 78,195 shares of the Company's common stock. For the 2019 fiscal year, Defendant Burgess received $312,977 in compensation from the Company. This included $75,000 in fees earned or cash paid, and $237,977 in stock awards.

26.     Defendant Coxe has served as a Company director since 1993. He also serves as a member of the Compensation Committee. Apart from Nvidia, Coxe has been a managing director of Sutter Hill Ventures, a venture capital investment firm, since 1989, where he focuses on investments in the IT sector. Fellow Defendant Gaither is also a managing director at Sutter Hill Ventures, and the two have a longstanding personal and professional relationship that renders them not independent of each other. According to the 2018 Proxy Statement, Defendant Coxe beneficially owned 1,265,485 shares of the Company's common stock. For the 2019 fiscal year, Defendant Coxe received $312,977 in compensation from the Company. This included $75,000 in fees earned or cash paid, and $237,977 in stock awards.

27.     During the period of time when the Individual Defendants materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Coxe made the following sale of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| September 18, 2017 | 50,000 | $      189.62 | $      9,481,000 |

His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme and allowed him to financially benefit from the scheme.

28.     Defendant Drell has served as a Company director since 2015. She also serves as a member of the Compensation Committee.  Apart from Nvidia, Drell has been the Provost of Stanford University since 2017 and has bene on the school's faculty since 2002, during which time Stanford has received pecuniary benefits and established personal connections with Defendants McCaffery and Seawell as well as members of Sutter Hill Ventures, a technology-focused investment firm where fellow Defendants Coxe and Gaither have long served as managing directors.  According to the 2019 Proxy Statement, Defendant Drell beneficially owned 20,963 shares of the Company's common stock.  For the 2019 fiscal year, Defendant Drell received $312,977 in compensation from the Company.  This included $75,000 in fees earned or cash paid, and $237,977 in stock awards.

29.     During the period of time when the Individual Defendants materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Drell made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | | Proceeds | |
|---|---|---|---|---|---|
| December 20, 2017 | 606 | $ | 197.07 | $ | 119,424 |
| March 28, 2018 | 5,141 | $ | 220.73 | $ | 1,134,772 |

Therefore, in total, before the fraud was exposed, she sold 5,747 Company shares on inside information, for which she received approximately $1.3 million.  Her insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme and allowed her to financially benefit from the scheme.

30.     Defendant Gaither has served as a Company director since 1998.  He also serves as a member of the Nominating and Corporate Governance Committee.  According to the 2019 Proxy Statement, Defendant Gaither beneficially owned 112,019 shares of the Company's common stock.  For the 2019 fiscal year, Defendant Gaither received $312,977 in compensation from the Company.  This included $75,000 in fees earned or cash paid, and $237,977 in stock awards.

31.     During the period of time when the Individual Defendants materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Gaither made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | | Proceeds | |
|---|---|---|---|---|---|
| February 15, 2018 | 40,359 | $ | 247.67 | $ | 9,914,995 |
| May 31, 2018 | 45,000 | $ | 253.59 | $ | 11,411,550 |

Therefore, in total, before the fraud was exposed, he sold 85,359 Company shares on inside information, for which he received approximately $21.3 million.  His insider sales made with knowledge of material non-public information before the material misstatements and omissions

were exposed demonstrate his motive in facilitating and participating in the scheme and allowed him to financially benefit from the scheme.

32.     Defendant Hudson has served as a Company director since 2013.  She also serves as a member of the Audit Committee.  According to the 2019 Proxy Statement, Defendant Hudson beneficially owned 93,229 shares of the Company's common stock.  For the 2019 fiscal year, Defendant Hudson received $312,977 in compensation from the Company.  This included $75,000 in fees earned or cash paid, and $237,977 in stock awards.

33.     During the period of time when the Individual Defendants materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Hudson made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| November 13, 2017 | 15,000 | $    213.44 | $    3,201,600 |
| November 22, 2017 | 3,052 | $    214.39 | $    654,318 |

Therefore, in total, before the fraud was exposed, she sold 18,052 Company shares on inside information, for which she received approximately $3.9 million.  Her insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme and allowed her to financially benefit from the scheme.

34.     Defendant Jones has served as a Company director since 1993.  He also serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee.  According to the 2019 Proxy Statement, Defendant Jones beneficially owned 355,674 shares of the Company's common stock.  For the 2019 fiscal year, Defendant Jones

received $312,977 in compensation from the Company.  This included $75,000 in fees earned or cash paid, and $237,977 in stock awards.

35.     During the period of time when the Individual Defendants materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Jones made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| September 21, 2017 | 100,000 | $ 185.65 | $ 18,565,000 |
| June 26, 2018 | 100,000 | $ 242.11 | $ 24,211,000 |

Therefore, in total, before the fraud was exposed, he sold 200,000 Company shares on inside information, for which he received approximately $42.8 million.  His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme and allowed him to financially benefit from the scheme.

36.     Defendant Michael G. McCaffery ("McCaffery") has served as a Company director since 2015.  Apart from Nvidia, McCaffery is the Chairman and a Managing Director of Makena Capital Management, an investment management firm that has a longstanding relationship with Stanford University. He also serves as Chair of the Audit Committee.  According to the 2019 Proxy Statement, Defendant McCaffery beneficially owned 31,571 shares of the Company's common stock.  For the 2019 fiscal year, Defendant McCaffery received $312,977 in compensation from the Company.  This included $75,000 in fees earned or cash paid, and $237,977 in stock awards.

37.     Defendant Perry has served as a Company director since 2005.  He also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. According to the 2019 Proxy Statement, Defendant Perry beneficially owned 71,243 shares of the

Company's common stock.  For the 2019 fiscal year, Defendant Perry received $312,977 in compensation from the Company.  This included $75,000 in fees earned or cash paid, and $237,977 in stock awards.

38.     During the period of time when the Individual Defendants materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Perry made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| August 14, 2017 | 16,281 | $      162.24 | $      2,641,429 |
| February 12, 2018 | 17,307 | $      227.93 | $      3,944,784 |

Therefore, in total, before the fraud was exposed, he sold 33,588 Company shares on inside information, for which he received approximately $6.6 million.  His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme and allowed him to financially benefit from the scheme.

39.     Defendant Seawell has served as a director for the Company since 1997.  He also serves as a member of the Compensation Committee.  Apart from Nvidia, Seawell has extensive connections with Stanford University, having received undergraduate and graduate degrees from the institution and also serving on multiple of the school's boards. According to the 2019 Proxy Statement, Defendant Seawell beneficially owned 180,481 shares of the Company's common stock.  For the 2019 fiscal year, Defendant Seawell received $312,977 in compensation from the Company.  This included $75,000 in fees earned or cash paid, and $237,977 in stock awards.

40.     During the period of time when the Individual Defendants materially misstated information to the investing public to keep the stock price inflated, and before the scheme was

exposed, Defendant Seawell made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| September 1, 2017 | 30,000 | $    170.19 | $    5,105,700 |
| November 20, 2017 | 1,029 | $    214.10 | $    220,308 |
| June 4, 2018 | 20,000 | $    264.64 | $    5,292,800 |
| June 5, 2018 | 1,029 | $    264.85 | $    272,530 |

Therefore, in total, before the fraud was exposed, he sold 52,058 Company shares on inside information, for which he received approximately $10.9 million.  His insider sales made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme and allowed him to financially benefit from the scheme.

41.     Defendant Stevens has served as a Company director since 2008 as well as from 1993-2006.  He also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee.  According to the 2019 Proxy Statement, Defendant Stevens beneficially owned 1,945,117 shares of the Company's common stock.  For the 2019 fiscal year, Defendant Stevens received $312,977 in compensation from the Company.  This included $75,000 in fees earned or cash paid, and $237,977 in stock awards.

42.     During the period of time when the Individual Defendants materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Stevens made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|

13

| September 20, 2017 | 80,250 | $ | 187.23 | $ | 15,025,207 |
| June 13, 2018 | 38,040 | $ | 263.61 | $ | 10,027,724 |

Therefore, in total, before the fraud was exposed, he sold 118,290 Company shares on inside information, for which he received approximately $25.1 million.  His insider sales made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme and allowed him to financially benefit from the scheme.

43.     The defendants referenced above in ¶¶ 21-42 are sometimes referred to herein as the "Individual Defendants."

## **DUTIES OF THE INDIVIDUAL DEFENDANTS**

44.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

45.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

14

46.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of NVIDIA were required to, among other things:

      a.     ensure the Company's compliance with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investors;

      b.     conduct the affairs of the Company in a lawful, efficient, business-like manner in order to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

      c.     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

      d.     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

      e.     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

47.     Each Individual Defendant, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

48. NVIDIA also maintains a Code of Conduct (the "Code"). The Code is a guide to how the Company and its employees should conduct themselves in their professional relationships.

49. The Code states that "[e]very NVIDIA employee and board member is expected to read, understand, and comply with Our Code." The Code goes on to state "[f]ailing to abide by Our Code, NVIDIA's policies, or applicable law and regulations can lead to disciplinary action, up to and including termination of employment or service."

50. The Code goes on to provide in pertinent part:

**We make ethical decisions**

- When we face difficult decisions at NVIDIA, we take the time to consider the implications of our actions regarding the law, Our Code, and other NVIDIA policies.

- We ask ourselves what the impact would be if our conduct or action became public or came to the attention of colleagues we respect.

- When it comes to ethical conduct, err on the side of caution. If we're unsure of what to do, we ask our manager, our human resources or legal representative, or NVIDIA Compliance.

- Managers at NVIDIA must serve as role models and are expected to provide proper guidance to employees.

          \*        \*        \*

**We do not trade on or disclose non-public information**

- We don't trade NVIDIA stock while we are aware of material, non-public information or outside of designated trading periods (unless under a 10b51 trading plan).

- We don't discuss material, nonpublic information about NVIDIA with anyone outside NVIDIA, or those within NVIDIA without a valid need to know.

- We don't make recommendations to anyone regarding the buying, selling, or holding of NVIDIA stock.

          \*        \*        \*

**We meet our disclosure obligations**

- We are committed to full, fair, accurate, timely, and clear disclosure in reports and documents that we file with or submit to government agencies, as well as in other public communications or in material that we develop for internal use.

51. The Company has also adopted a Financial Team Code, which "sets forth principles adopted by NVIDIA to create the highest level of confidence in its accounting policies, financial reporting, underlying systems of internal controls and its financial employees."

52. The Financial Team Code applies to "[o]ur board of directors, members of our executive staff, all members of our finance organization worldwide and all employees directly involved in the preparation and review of externally-reported periodic financial reports, filings and documents of NVIDIA (collectively, the "Financial Team")." All of whom "are expected to abide by this Financial Team Code."

53. The Financial Team Code goes on to state:

As a member of our Financial Team, you must:

- Act honestly, ethically and fairly, avoiding actual or apparent conflicts of interest. If there is even the potential for conflict or ambiguity between what is and is not permitted, the conduct in question must be avoided.

- Act in compliance with all applicable governmental laws, rules and regulations in each jurisdiction to which NVIDIA is subject.

- Act in good faith with integrity, and without misrepresenting or failing to disclose material facts known to you with respect to your financial duties to NVIDIA.

- Communicate information in a clear manner that ensures full, fair, accurate, timely and understandable disclosure in all reports and documents that NVIDIA files with, or submits to, government agencies and in other public communications or develops for internal use.

- Ensure that material information required to be disclosed by NVIDIA in the reports that it files or submits pursuant to applicable law is recorded, processed, summarized and reported, within the time periods specified in applicable law.

- Maintain records that accurately and fairly reflect the transactions and dispositions of NVIDIA assets and assure that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles.

- Ensure that NVIDIA's approved business processes, financial policies and internal controls related to financial reporting are followed by NVIDIA personnel and NVIDIA-retained consultants, including a duty to report any perceived deficiencies in or suspected violations of the same.

- Take appropriate measures to safeguard NVIDIA's assets from misappropriation, embezzlement or impairment and to properly validate any disbursements of cash or transfers of such assets prior to any disbursement or transfer.

- NOT directly or indirectly, make or cause to be made, a materially false or misleading statement regarding business processes, financial policies and internal controls related to financial reporting.

- NOT omit material facts or make misleading statements to an accountant in connection with an audit of NVIDIA's financial statements or the preparation or filing of any document to be filed with the SEC or any other similar regulatory entity worldwide;

- NOT directly or indirectly take any action to fraudulently influence, coerce, manipulate, or mislead any independent registered public accounting firm engaged in the performance of an audit or review of the financial statements of NVIDIA that are required to be filed with the SEC or any other similar regulatory entity worldwide if that person knew, or was unreasonable in not knowing, that such action could result in rendering such financial statements materially misleading.

54.    In addition, NVIDIA's Board abides by its Corporate Governance Policies of The Board of Directors (the "Corporate Governance Policies").  Pursuant to the Corporate Governance Policies:

The Company's management is responsible for:  (i) development of strategic, financial and management policies of the Company for consideration by the Board; (ii) the operations of the Company in accordance with such policies; (iii) timely preparation of financial statements and other reports about the Company, and informing the Board about the Company's operations; and (iv) identification and management of the Company's risks and development of risk mitigation strategies.

The Board is responsible for protecting and enhancing the assets of the Company and serving the best interests of the Company's stockholders.  These duties include:

(i) monitoring the effectiveness of management and Company policies and decisions; and (ii) oversight of the Company's risk management process, which shall include periodic review of management's risk analysis.

55.     In addition, the Company's Audit Committee is specifically tasked with the Board's oversight responsibilities.   The conduct of the Audit Committee is governed by the Audit Committee Charter (the "Charter").

56.     Pursuant to the Charter:

**PURPOSE**

The Audit Committee (the "Audit Committee") is appointed by the Board of Directors (the "Board") of NVIDIA Corporation, a Delaware corporation (the "Company"), to act on behalf of the Board in fulfilling the Board's oversight responsibilities with respect to the Company's corporate accounting and reporting practices and the quality and integrity of the Company's consolidated financial statements (the "financial statements"), reports and systems of internal control over financial reporting, as well as the qualifications, independence and performance of the Company's independent registered public accounting firm engaged for the purposes of preparing or issuing an audit report or performing audit services (the "Auditors").

The policy of the Audit Committee in discharging these obligations shall be to maintain and foster an open avenue of communication between the Audit Committee, the Vice President of Internal Audit or other members of the Company's Internal Audit department (the "Internal Auditors"), the Auditors, and the Company's financial management.  The Audit Committee shall also provide oversight in connection with legal, regulatory and ethical compliance programs as established by management and help the Board oversee the Company's legal and regulatory compliance.

\*          \*          \*

**RESPONSIBILITIES AND DUTIES**

The Audit Committee shall oversee the Company's financial reporting process (including direct oversight of the Auditors) on behalf of the Board, shall have direct responsibility for the appointment, compensation, retention and oversight of the work of the Auditors and any other registered public accounting firm engaged for the purpose of performing other review or attest services for the Company.  The Auditors and each such other registered public accounting firm shall report directly and be accountable to the Audit Committee.  The Audit Committee's functions and procedures should remain flexible to address changing circumstances most effectively.  To implement the Audit Committee's purpose and policy, the Audit

Committee shall be charged with the following functions and processes, with the understanding, however, that the Audit Committee may supplement or (except as otherwise required by law or the applicable rules) deviate from these activities as appropriate under the circumstances:

**REVIEW PROCEDURES**

1.      Review and assess the adequacy of this Charter, annually in accordance with NASDAQ rules and regulations.  Submit the Charter or any recommendations of proposed changes to the Board for approval.

2.      Review and recommend to the Board, upon completion of the annual audit, the financial statements, any internal controls report, and as appropriate, "Risk Factors" to be included in the Company's Annual Report on Form 10-K and any internal controls report.  Review should include oversight of the Auditors' assessment of the quality, not just acceptability, of accounting principles, the reasonableness of significant judgments and estimates (including material changes in estimates), the nature of significant risks and exposures, any audit adjustments noted or proposed by the Auditors (whether "passed" or implemented in the financial statements), the adequacy of the disclosures in the financial statements and any other matters required to be communicated to the Audit Committee by the Auditors.

3.      In consultation with the management, the Internal Auditors and the Auditors, review Company's guidelines and policies with respect to risk assessment, risk management and internal financial and disclosure controls.

4.      Discuss with management and the Auditors the results of the Auditors' review of the Company's quarterly financial statements, prior to public disclosure of quarterly financial information, if practicable, or filing with the SEC of the Company's Quarterly Report on Form 10-Q, and any other matters required to be communicated to the Audit Committee by the Auditors under applicable standards.

5.      To review generally with management and the Auditors, as appropriate, earnings press releases, as well as the substance of financial information and earnings guidance provided to analysts and ratings agencies.  The Chairperson of the Audit Committee may represent the entire Audit Committee for purposes of this discussion.

6.      Review periodically, either individually or as a committee and discuss with management and the Auditors, as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports to be filed with the SEC.

*       *       *

**LEGAL COMPLIANCE AND RISK MANAGEMENT**

22.    Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, including the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters as required by applicable law and as deemed appropriate.

23.    Investigate any matter brought to the attention of the Audit Committee within the scope of its duties if, in the judgment of the Audit Committee, such investigation is necessary or appropriate.  The Chairperson of the Audit Committee may represent the entire Audit Committee in making such determination.

24.    In conjunction with the Nominating and Corporate Governance Committee, review at least on an annual basis with senior management any proposed revisions to, and compliance with, the Company's Code of Conduct and Financial Team Code of Conduct.

25.    To review (at least annually) and approve the Company's decision to enter into swaps or other derivative transactions that are exempt from exchange-execution and clearance under "end-user exception" regulations established by the Commodity Futures Trading Commission, and to review and discuss with management the Company's Foreign Exchange Policy, including the Company's use of swaps.

26.    Review and discuss with management and the Auditors the Company's processes and policies on risk identification, management and assessment in all areas of the Company's business, including financial and accounting.  Areas of focus shall include the Company's policies and other matters relating to the Company's investments, cash management and foreign exchange management, major financial risk exposures, the adequacy and effectiveness of the Company's information security policies and practices and the internal controls regarding information security, and the steps taken by management to monitor and mitigate or otherwise control these exposures and to identify future risks.

57.    In violation of the Charter, and their general duties as members of the Audit Committee, Defendants Hudson, McCaffrey, Perry and Stevens, who were members of the Audit Committee conducted little, if any, oversight of the Company's internal controls or the Company's compliance with legal and regulatory requirements resulting in materially false and misleading statements regarding the Company's business, operational and compliance policies, and consciously disregarded their duties to monitor such controls over reporting.  The Audit

Committee members' complete failure to perform their duties in good faith resulted in false misrepresentations to the SEC, the investing public, and the Company's shareholders.

58.     Each of the Individual Defendants further owed to NVIDIA and its shareholders the duty of loyalty requiring that each favor NVIDIA's interest and that of its shareholders over their own while conducting the affairs the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

## SUBSTANTIVE ALLEGATIONS

### THE INDIVIDUAL DEFENDANTS CAUSE THE COMPANY TO FILE THE FALSE AND MISLEADING STATEMENTS ISSUED DURING THE RELEVANT PERIOD

59.     On August 10, 2017, NVIDIA issued a press release which was also attached to its Form 8-K filed with the SEC, announcing its financial results for its second fiscal quarter ended July 30, 2017.  The Company reported that it had experienced "record revenue . . . of $2.23 billion, up 56 percent from $1.43 billion a year earlier, and up 15 percent from $1.94 billion in the previous quarter."   Defendant Huang was quoted in the press release stating that business growth acceleration was due to "[d]atacenter revenue increase[ing] more than two and a half times," "a growing number of car and robot-taxi companies…choosing our DRIVE PX self-driving computing platform," and NVIDIA technology being used to "power the fastest growing platforms – GeForce and Nintendo Switch."

60.     The same day of the August 10, 2017 press release, the Company held a conference call to discuss NVIDIA's earnings and operations with investors and analysts.  Defendant Huang responded to questions regarding how the Company was managing the volatility of the cryptocurrency market by asserting: "our strategy is to stay very, very close to the market.  We understand its dynamics really well."   Defendant Huang insisted that NVIDIA would not be

harmed by the volatile cryptocurrency market since "the larger of a GPU company you are, the greater ability you could absorb the volatility."

61.     On November 9, 2017, NVIDIA issued a press release announcing its financial results for its third quarter ended October 29, 2017 in a press release that was also attached to the Company's Form 8-K filed with the SEC.  The Company reported that it had experienced "record revenue . . . of $2.64 billion, up 32 percent from $2.00 billion a year earlier, and up 18 percent from $2.23 billion in the previous quarter."  Defendant Huang was quoted in the press release as stating:

> Our Volta GPU has been embraced by every major internet and cloud service provider and computer maker.  Our new TensorRT inference acceleration platform opens us to growth in hyperscale datacenters.  GeForce and Nintendo Switch are tapped into the strongest growth dynamics of gaming.  And our new DRIVE PX Pegasus for robotaxis has been adopted by companies around the world.  We are well positioned for continued growth.

62.     NVIDIA held a press conference that same day with investors and analysts.  During this press conference, Defendant Kress stated:

> GPU sales also benefited from continued cryptocurrency mining.  We met some of this demand with a dedicated board in our OEM business and a portion with GeForce GTX boards, though it's difficult to quantify.  We remain nimble in our approach to the cryptocurrency market.  It is volatile, does not and will not distract us from focusing on our core gaming markets.

63.     During the conference call, Analyst Atif Malik of Citigroup Inc. asked: "why should we think that crypto won't impact the gaming demand in the future?  If you can, just talk about the steps NVIDIA has taken with respect to having a different load and all that."  Defendant Huang responded by stating:

> The longer-term way to think about that is this.  Crypto is small for us, but not zero.  And I believe that crypto will be around for some time, kind of like today.  There will be new currencies emerging.  Existing currencies would grow and value.  The interest in mining these new emerging currency crypto algorithms that emerge are going to continue to happen.  And so I think for some time, we're going to see that crypto will be a small but not zero part of our business.

23

When you think about crypto in the context of our company overall, the thing to remember is that we're the largest GPU computing company in the world.  And our overall GPU business is really sizable.   We have multiple segments…And you know of course that we have gaming.  And so these different segments are all quite large and growing.  And so my sense is that although crypto will be here to stay, it will remain small but not zero.

64.     On November 29, 2017, NVIDIA presented at the Credit Suisse Technology, Media, and Telecom Conference.   At the conference, Credit Suisse Managing Director John William Pitzer ("Pitzer") commented that "it was the first time that [NVIDIA] had mentioned cryptocurrency as being partly driven by . . . the gaming side of the business."  While Defendant Kress did acknowledge that cryptomining made up a portion of the sales it had previously attributed to gaming GPUs, she continued to downplay the impact of cryptocurrency demand on NVIDIA's gaming business, stating that "there probably is some residual amount or some small amount in terms of that . . . [w]e do believe the majority does reside in terms of our overall crypto card."

65.     In early 2018, cryptocurrency prices began to decline but NVIDIA's GPU sales continued to increase.  The Company attributed this to the "pent up demand" for affordable GPUs by gaming consumers after the GPU price rises from the increased cryptomining demand.  During this time, NVIDIA continued to assure investors that cryptomining was a small portion of its business and therefore the declining cryptocurrency market would not negatively impact the Company.

66.     On February 8, 2018, NVIDIA announced its financial results for its fourth quarter and full year ended January 28, 2018 in a press release that was also attached to the Company's Form 8-K filed with the SEC.  The press release stated, "[r]ecord quarterly revenue of $2.17 billion, up 55 percent from a year ago.  Record full-year revenue of $6.91 billion, up 38 percent from a year ago, [and the] GPU computing platform continues to power gains across full product line."

67.     The same day as the February 8, 2018 press release, NVIDIA held a conference call with investors and analysts.  During the call, Defendant Kress stated that the Company met some of the cryptocurrency demand with "a dedicated board in our OEM business and some was met with our gaming GPUs.  This contributed to lower than historical channel inventory levels of our gaming GPUs throughout the quarter."  Defendant Kress did acknowledge that the contribution of cryptocurrency to the Company's business was a higher percentage of Company revenue than in the prior quarter, but she also stressed that the Company's main focus remains on its core gaming market.  During this conference call, Defendant Huang stated, "there is a fairly sizable pent up demand going into this quarter" for NVIDIA's GPUs.  Defendant Huang also claimed that the GPU supply channel was "relatively lean" and that the Company was "working really hard to get GPUs down to the marketplace for the gamers."

68.     On February 26, 2018, NVIDIA presented at the Morgan Stanley Technology, Media & Telecom Conference.  During the conference, an analyst asked NVIDIA why its GPU sales were constrained and how it was prioritizing sales to respond to that constraint.  Defendant Kress responded to these questions by stating that the "channels had been influenced by not only the strength of the overall gaming that we had seen for the overall holiday season, but also the large uptick that we've seen in the overall valuation of cryptocurrency."  Kress added that the Company's focus was on ensuring that "gamers worldwide receive the cards that we want to do."

69.     On February 28, 2018, the Company filed its annual report for the fiscal year ended January 28, 2018 on a Form 10-K (the "2018 10-K) with the SEC, which was signed by Defendants Huang, Kress, Burgess, Coxe, Drell, Gaither, Hudson, Jones, McCaffery, Perry, Seawell and Stevens.

70.     Regarding revenue growth and the GPU business, the 2018 10-K stated:

**GPU Business.**  GPU business revenue increased by 40% in fiscal year 2018 compared to fiscal year 2017 led by growth in gaming, datacenter and professional visualization.  Revenue from sales of GeForce GPU products for gaming increased over 20%, reflecting continued strong demand for our Pascal-based GPU products. Datacenter revenue, including Tesla, GRID and DGX, increased 133%, reflecting strong demand from hyperscale and cloud customers for deep learning training and accelerated GPU computing as well as demand for HPC, DGX AI supercomputing and GRID virtualization platforms.  Revenue from Quadro GPUs for professional visualization increased by 12% due primarily to higher sales in both high end desktop and mobile workstation products.  Revenue from GeForce GPU products for mainstream PC OEMs increased by over 90% due primarily to strong demand for GPU products targeted for cryptocurrency mining.

71.     Certifications signed by Defendants Huang and Kress, attesting to the accuracy of the 2018 10-K, were attached to the 2018 10-K pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX").

72.     On April 6, 2018, the Company filed its 2018 Proxy Statement (the "2018 Proxy Statement") with the SEC.

73.     The 2018 Proxy Statement was issued by the Board, including Defendants Huang, Burgess, Coxe, Drell, Gaither, Hudson, Jones, McCaffery, Perry, Seawell, and Stevens, and sought shareholder votes on, among other things, (1) election of eleven directors nominated by the Board of Directors, (2) approval of our executive compensation, and (3) approval of an amendment and restatement of the Company's Amended and Restated 2007 Equity Incentive Plan.

74.     Defendants Huang, Burgess, Coxe, Drell, Gaither, Hudson, Jones, McCaffery, Perry, Seawell, and Stevens drafted, approved, reviewed, and/or signed the 2018 Proxy Statement before it was filed with the SEC and disseminated to NVIDIA's stockholders.  Defendants Huang, Burgess, Coxe, Drell, Gaither, Hudson, Jones, McCaffery, Perry, Seawell, and Stevens negligently issued materially misleading statements in the 2018 Proxy Statement.  These 2018 Proxy Statement allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they do not

allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the 2018 Proxy Statement.

75.     Among other things, the 2018 Proxy Statement provided information about the director nominees up for election, Defendants Huang, Burgess, Coxe, Drell, Gaither, Hudson, Jones, McCaffery, Perry, Seawell, and Stevens.  In addition, the 2018 Proxy Statement described director responsibilities, the duties of each committee, Board risk assessment and management, and explicitly referenced the Code of Conduct, which included special ethical obligations regarding financial reporting such that all SEC filings are to be accurate.

76.     In addition, the 2018 Proxy Statement stated:

**Role of the Board in Risk Oversight**

The Board is responsible for overseeing risk management at NVIDIA.  The Board exercises direct oversight of strategic risks to NVIDIA and other risk areas not delegated to one of its committees.  Our AC [Audit Committee] has the responsibility to consider and discuss our major financial risk exposures and the steps our management has taken to monitor and control these exposures.  The AC also monitors compliance with certain legal and regulatory requirements and oversees the performance of our internal audit function.  Our NCGC [Nominating and Corporate Governance Committee] monitors the effectiveness of our anonymous tip process and corporate governance guidelines, including whether they are successful in preventing illegal or improper liability-creating conduct, and oversees corporate social responsibility risks.  Our CC [Compensation Committee] assesses and monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking.

Management periodically provides information, including guidance on risk management and mitigation, to the Board or relevant committee.  Each committee also reports to the Board on those matters.

**Corporate Governance Policies of the Board of Directors**

**The Board has documented our governance practices by adopting Corporate Governance Policies to ensure that the Board will have the necessary authority and processes in place to review and evaluate our business operations as needed and to make decisions that are independent of our management.**  The Corporate Governance Policies set forth the practices the Board follows with

respect to board composition and selection, regular evaluations of the Board and its committees, board meetings and involvement of senior management, chief executive officer performance evaluation, and board committees and compensation.  Our Corporate Governance Policies may be viewed under Corporate Governance in the Investor Relations section of our website at www.nvidia.com.  (Emphasis added).

77.     The 2018 Proxy Statement was false and misleading because it solicited NVIDIA shareholder votes for director reelection even though the Individual Defendants were aware, but had failed to disclose that:  (1) the Individual Defendants were operating in violation of the Company's Code of Conduct and Financial Team Code; (2) NVIDIA's GPU sales growth was significantly affected by the demand for GPUs for use in cryptocurrency related activities; (3) the Company had not mastered its inventory channel; (4) the Company was unable to adapt to the volatility of the cryptocurrency market; (5) while the price of cryptocurrencies fell, the Company continued to inject mid-range GPUs into the inventory channel, disguising stagnating cryptomining-related growth; (6) the increased supply of midrange GPUs to the inventory channel would foreseeably lead to 3 months of oversupply in the channel; (7) the Company failed to maintain internal controls; and (8) that, as a result of the foregoing, the Individual Defendants' statements about NVIDIA's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

78.     In addition to the election of directors, the 2018 Proxy Statement sought shareholder approval of NVIDIA's named executive officer ("NEO") compensation and approval of an amendment and restatement of the Company's Amended and Restated 2007 Equity Incentive Plan.  Both of these proposals dealt with the compensation of the Individual Defendants.

79.     As to the NEO compensation, Defendants Huang, Burgess, Coxe, Drell, Gaither, Hudson, Jones, McCaffery, Perry, Seawell, and Stevens stated:

We are asking our stockholders to cast a non-binding vote, also known as "say-on-pay," to approve our NEOs' compensation.   The Board believes that our

compensation policies and practices are effective in achieving our goals of attracting, motivating and retaining a high-caliber executive team; rewarding financial and operating performance; and aligning our executives' interests with those of our stockholders to create long-term value.  The Board and our stockholders have approved annual "say-on-pay" votes.

80.    The 2018 Proxy Statement went on to say:

Our executive compensation program is designed to pay for performance.  We utilize compensation elements that strongly align our NEOs' interests with those of our stockholders to create long-term value.  Our NEO pay is heavily weighted toward performance-based, "at-risk" variable cash and long-term equity awards that are only earned if we achieve pre-established corporate financial metrics.

*        *        *

We design our executive compensation program to pay for performance and to attract, motivate and retain a high-caliber executive team.  Our program aligns our NEOs' interests with those of our stockholders, creating long-term value.  NEO pay is heavily weighted toward performance-based variable cash and long-term equity awards that are only earned if we achieve pre-established corporate financial metrics such as revenue, Non-GAAP Operating Income, and TSR.  In Fiscal 2018, performance-based compensation represented 92% and 57% of the total target pay of Mr. Huang and our Other NEOs, respectively.

81.    As to the Amended and Restated 2007 Equity Incentive Plan, Defendants Huang,

Burgess, Coxe, Drell, Gaither, Hudson, Jones, McCaffery, Perry, Seawell, and Stevens stated:

We are asking our stockholders to approve an amendment and restatement of our 2007 Plan primarily to increase the share reserve by 23,000,000 shares and to impose a minimum vesting requirement of 12 months from the date of grant on all awards under the Proposed 2007 Plan.  The Board recommends a vote FOR this proposal because equity awards are an important component of our compensation program and the continued ability to issue these awards is essential to attracting, retaining and motivating our employees.

82.    The Amended and Restated 2007 Equity Incentive Plan itself states:

**Purpose of the Proposed 2007 Plan and Effect of Stockholder Approval**

Competition for talent in our industry and in Silicon Valley is more intense than ever, and equity is a key component of our recruitment and retention efforts.  If the Proposed 2007 Plan is approved by our stockholders, we will utilize the Proposed 2007 Plan to award equity and performance incentives, at levels determined appropriate by our CC, to secure and retain our employees, consultants, and directors, and to align their interests with those of our stockholders.

29

83.   The Plan goes on to state:

*Purpose.*   The Proposed 2007 Plan is designed to provide incentives for our employees, directors, and consultants to exert maximum efforts for our success, and to give them an opportunity to benefit from increases in the value of our common stock.

*      *      *

*Performance Awards.*   We may grant performance stock and cash awards, including Section 162(m) "performance-based compensation".   However, to qualify as Section 162(m) performance-based compensation, among other requirements, such awards must be eligible to qualify for the Section 162(m) Transition Relief (as described in *Section 162(m) Transition Relief for Performance-Based Compensation* above).

A performance stock award and a performance cash award is payable (for performance stock awards, including that may be granted, vest, or be exercised) contingent upon the achievement of specified performance goals during a specified performance period, and may also require completion of a specified period of continuous service.   Subject to the limitations described in *Minimum Vesting Requirements* above, the length of any performance period, the performance goals to be achieved, and the measure of whether and to what degree such performance goals have been attained will be determined by the CC, except that the Plan Administrator also may make any such determinations to the extent that the award is not intended to qualify as Section 162(m) performance-based compensation. The Plan Administrator may specify the form of payment of performance cash awards, or may provide for a participant to have the option for his or her performance cash award, or such portion thereof as the Plan Administrator may specify, to be paid in whole or in part in cash or other property.   In addition, to the extent permitted by applicable law and the applicable award agreement, the Plan Administrator may determine that cash may be used in payment of performance stock awards, or that common stock authorized under the Proposed 2007 Plan may be used in payment of performance cash awards.   If a participant's continuous service terminates due to his or her death, the participant's outstanding performance stock awards will be deemed to have been earned at the target level of performance, and become fully vested and issued.

For any performance award intended to qualify as Section 162(m) performance-based compensation, (i) the CC will set a performance period over which the attainment of one or more performance goals will be measured, (ii) no later than the earlier of the 90th day of a performance period and the date on which 25% of the performance period has elapsed, and at a time when the achievement of the performance goals remains substantially uncertain, the CC will establish the performance goals based upon one or more performance criteria enumerated in the Proposed 2007 Plan and described below, (iii) as soon as administratively practicable following the end of the performance period, the CC will certify in

30

writing whether the performance goals have been satisfied, and (iv) the CC may reduce or eliminate the compensation or economic benefit due upon the attainment of the applicable performance goals as the CC may determine.  However, to qualify as Section 162(m) performance-based compensation, among other requirements, any such award must be eligible to qualify for the Section 162(m) Transition Relief (as described in *Section 162(m) Transition Relief for Performance-Based Compensation* above).

84.     As detailed herein, Defendants Huang, Burgess, Coxe, Drell, Gaither, Hudson, Jones, McCaffery, Perry, Seawell, and Stevens were aware, but had failed to disclose to NVIDIA's shareholders that:  (1) the Individual Defendants were operating in violation of the Company's Code of Conduct and Financial Team Code; (2) NVIDIA's GPU sales growth was significantly affected by the demand for GPUs for use in cryptocurrency related activities; (3) the Company had not mastered its inventory channel; (4) the Company was unable to adapt to the volatility of the cryptocurrency market; (5) while the price of cryptocurrencies fell, the Company continued to inject mid-range GPUs into the inventory channel, disguising stagnating cryptomining-related growth; (6) the increased supply of midrange GPUs to the inventory channel would foreseeably lead to 3 months of oversupply in the channel; (7) the Company failed to maintain internal controls; and (8) that, as a result of the foregoing, the Individual Defendants' statements about NVIDIA's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

85.     On May 10, 2018, NVIDIA issued a press release announcing its financial results for the first quarter ended April 29, 2018.  The press release stated, "record revenue . . . of $3.21 billion, up 66 percent from $1.94 billion a year earlier, and up 10 percent from $2.91 billion in the previous quarter."  In the press release, Defendant Huang attributed the revenue growth to the Company's datacenter business and the fact that its gaming business remained strong.

86.     During a conference call held on that same day, Defendant Huang maintained that the Company's GPU gaming sales were not driven by cryptomining.  Specifically, Defendant

Huang stated "we try to as transparently review our numbers as best we can. Our strategy is to create a SKU that allows the crypto miners to fulfill their needs . . . [a]nd to . . . as much as possible, fulfill their demand that way."

87.     On May 16, 2018, NVIDIA held its annual shareholder meeting, during which Defendant Huang continued to minimize the impact of cryptocurrency mining on NVIDIA's growth, stating, "Ethereum and crypto mining is a recent GPU application. It is a bonus in our business, but volatile. It's not really a factor in our core business. We have great growth drivers without crypto." Defendant Huang explained to investors that "our core businesses in gaming and high-performance computing and artificial intelligence and in self-driving cars are doing so well that with or without crypto mining, we have . . . a wonderful growth business behind us."

88.     The statements made in ¶¶ 59-87 were materially false and misleading, and they failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that:  (1) the Company had not mastered its inventory channel; (2) the Company was unable to adapt to the volatility of the cryptocurrency market; (3) while the price of cryptocurrencies fell, the Company continued to inject mid-range GPUs into the inventory channel, disguising stagnating cryptomining-related growth; (4) the increased supply of midrange GPUs to the inventory channel would foreseeably lead to 3 months of oversupply in the channel; and (5) the Company failed to maintain internal controls. As a result, the Company's public statements were materially false and misleading at all relevant times.

### THE TRUTH BEGINS TO EMERGE

89.     On August 16, 2018, NVIDIA filed a current report on Form 8-K lowering its revenue guidance by 2.2% for the third quarter. The Company also revealed low expectations for

any significant growth coming from cryptocurrency mining through the end of the year. Additionally, the Company disclosed that its inventory of GPUs was up 30% from the previous quarter. Following these disclosures, NVIDIA's share price declined by $12.62 per share, or 4.9%. According to Defendant Kress, "[o]ur revenue outlook had anticipated cryptocurrency-specific products declining to approximately $100 million, while actual crypto-specific product revenue was $18 million. Whereas we had previously anticipated cryptocurrency to be meaningful for the year, we are now projecting no contributions going forward."

90.     During a conference call held that same day, Defendant Huang assured investors that the overstocked inventory would "work itself out" and asserted that NVIDIA was "not concerned about the channel inventory" because employees at NVIDIA "are masters at managing our channel, and we understand the channel very well."

91.     The statements made in ¶¶ 89-90 were materially false and misleading, and they failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company had not mastered its inventory channel; (2) the Company was unable to adapt to the volatility of the cryptocurrency market; (3) while the price of cryptocurrencies fell, the Company continued to inject mid-range GPUs into the inventory channel, disguising stagnating cryptomining-related growth; (4) the increased supply of midrange GPUs to the inventory channel would foreseeably lead to 3 months of oversupply in the channel; and (5) the Company failed to maintain internal controls. As a result, the Company's public statements were materially false and misleading at all relevant times.

## THE TRUTH IS REVEALED

92.     On November 15, 2018, NVIDIA revealed in a press release also attached to a Form 8-K filed with the SEC, that for the fourth fiscal quarter ended January 27, 2019 the Company's revenue would decline over 7%. Defendant Huang admitted that this decline was a direct result of the excess channel inventory of GPUs.

93.     As a result, NVIDIA stated that it would stop all shipments of mid-range GPUs from entering the inventory channel for at least a full quarter. The new disclosures were contradictory to the Company's prior assurances that the volatility of the cryptocurrency market would not affect the Company. Despite the Company statements that NVIDIA would need three months to correct the overstocked inventory, analysts questioned the Company's ability to do so in that period of time, remarking that this type of correction could take three quarters, not three months, to resolve.

94.     As noted in an article by *The Motley Fool*:

NVIDIA said it generated revenue of $3.181 billion, which came in below analysts' expectations that the graphics chip maker would report $3.24 billion on the top line. Management blamed the revenue miss on lower demand from cryptocurrency miners, who have been gobbling up high-end GPUs over the last year.

Management anticipated the lower demand from crypto miners given the softening of prices for cryptocurrencies in recent months. However, the elevated prices for some of these gaming cards have not come down to normal levels, making some cards too pricey for gamers to afford. As a result, there was an oversupply of gaming cards on the market during the quarter.[1]

95.     Based on *The Motley Fool* article, the Individual Defendants knew all along that the Company's high revenue numbers were in fact attributable to cryptocurrency miners and that their demand was "softening".

---

[1] John Ballard, *Why NVIDIA Stock Dropped 22% in November*, THE MOTLEY FOOL, (Dec. 10, 2018, 1:02 PM), https://www.fool.com/investing/2018/12/10/why-nvidia-stock-dropped-22-in-november.aspx.

96.     This same story was told repeatedly through other news outlets:

The company projected nearly $1 billion less revenue for the upcoming quarter than analysts expected, mainly as a result of it expecting cryptocurrency revenue drying up and too much unsold inventory of older products.  Nvidia's stock dropped more than 15% in after-hours trading to roughly $170.[2]

\*       \*       \*

Nvidia Corp., the biggest maker of chips for computer graphics cards, gave a disappointing sales forecast for the current quarter, showing the lingering loss of demand from the collapse of cryptocurrency mining.  The stock dropped more than 16 percent.

Revenue in the fiscal fourth quarter will be $2.7 billion, plus or minus 2 percent, the Santa Clara, California-based company said in a statement.  That compares to the average of analysts' estimates of $3.4 billion, according to data compiled by Bloomberg.

The company's founder and Chief Executive Officer Jensen Huang is trying to make Nvidia more than just the leading provider of technology that makes games more realistic.  Yet the gaming market still provides the company with the bulk of its sales.

The mining of cryptocurrency tokens, computer code that carries value in online transactions, had helped stoke demand for graphics chips.  Shortages related to a spike in demand from miners led to an oversupply of parts when the crypto market crashed.  That inventory needs to be sold before orders for new parts will pick up again, according to analysts.[3]

### REPURCHASES DURING THE RELEVANT PERIOD

97.     During the Relevant Period, the Individual Defendants caused NVIDIA to repurchase Company stock at artificially inflated prices that caused substantial damage to the Company.  Between August 28, 2017 and October 28, 2018, the Company repurchased 4.8 million shares of its own common stock for a total price of more than $1.1 billion.  Since the actual worth

---

[2] David Gershgorn, *The Crypto Party is Over for NVIDIA*, QUARTZ, (Nov. 15, 2018), https://qz.com/1465955/nvidia-cant-count-on-cryptocurrency-revenue-anymore/.
[3] Ian King, *NVIDIA Gives Lackluster Forecast on Inventory, Shares Plunge*, BLOOMBERG, (Nov. 15, 2018, 4:25 PM), https://www.bloomberg.com/news/articles/2018-11-15/nvidia-gives-weak-forecast-citing-inventory-stock-slumps.

of the Company stock at closing on November 19, 2018 was $144.70 per share, the Company overpaid by approximately $404.3 million in total for these repurchases.

98.     According to the Form 10-Q that the Company filed with the SEC on November 21, 2017, between August 28, 2017 and September 24, 2017, the Individual Defendants caused the Company to repurchase 1 million shares of its own common stock at an average price of approximately $180.56, for a total cost of $180.6 million to the Company.

99.     As a result of the artificial inflation of the Company's stock price caused by the misrepresentations and/or omissions caused to be made by the Individual Defendants, the Company paid on average $35.86 more than the actual worth of each share between August 28, 2017 and September 24, 2017.  Given this, the Company overpaid $35.8 million in total for repurchases of its own stock between August 28, 2017 and September 24, 2017.

100.    According to the Company's Form 10-Q filed with the SEC on May 22, 2018, between January 29, 2018 and February 25, 2018, the Individual Defendants caused the Company to repurchase two million shares of its own common stock at an average price of approximately $238.63 per share, for a total cost of approximately $477.3 million to the Company.

101.    As a result of the artificial inflation of the Company's stock price caused by the misrepresentations and/or omissions caused to be made by the Individual Defendants, the Company paid on average $93.93 more than the actual worth of each share between January 29, 2018 and February 25, 2018.  Given this, the Company overpaid more than $187.8 million in total for repurchases of its own stock between January 29, 2018 and February 25, 2018.

102.    According to the Company's Form 10-Q filed with the SEC on May 22, 2018, between February 26, 2018 and March 25, 2018, the Individual Defendants caused the Company

to repurchase one million shares of its own common stock at an average price of approximately $236.25 per share, for a total cost of approximately $236.3 million to the Company.

103.     As a result of the artificial inflation of the Company's stock price caused by the misrepresentations and/or omissions caused to be made by the Individual Defendants, the Company paid on average $91.55 more than the actual worth of each share between February 26, 2018 and March 25, 2018.  Given this, the Company overpaid more than $91.5 million in total for repurchases of its own stock between February 26, 2018 and March 25, 2018.

104.     According to the Company's Form 10-Q filed with the SEC on November 15, 2018, between July 30, 2018 and August 26, 2018 the Individual Defendants caused the Company to repurchase 116,000 shares of its own common stock at an average price of approximately $240.87 per share, for a total cost of approximately $27.9 million to the Company.

105.     As a result of the artificial inflation of the Company's stock price caused by the misrepresentations and/or omissions caused to be made by the Individual Defendants, the Company paid on average $96.17 more than the actual worth of each share between July 30, 2018 and August 26, 2018.  Given this, the Company overpaid more than $11.1 million in total for repurchases of its own stock between July 30, 2018 and August 26, 2018.

106.     According to the Company's Form 10-Q filed with the SEC on November 15, 2018, between August 27, 2018 and September 23, 2018, the Individual Defendants caused the Company to repurchase 567,000 shares of its own common stock at an average price of approximately $266.07 per share, for a total cost of approximately $150.9 million to the Company.

107.     As a result of the artificial inflation of the Company's stock price caused by the misrepresentations and/or omissions caused to be made by the Individual Defendants, the Company paid on average $121.37 more than the actual worth of each share between August 27,

2018 and September 23, 2018.  Given this, the Company overpaid more than $68.8 million in total for repurchases of its own stock between August 27, 2018 and September 23, 2018.

108.    According to the Company's Form 10-Q filed with the SEC on November 15, 2018, between September 24, 2018 and October 28, 2018, the Individual Defendants caused the Company to repurchase 82,000 shares of its own common stock at an average price of approximately $255.41 per share, for a total cost of approximately $20.9 million to the Company.

109.    As a result of the artificial inflation of the Company's stock price caused by the misrepresentations and/or omissions caused to be made by the Individual Defendants, the Company paid on average $110.71 more than the actual worth of each share between September 24, 2018 and October 28, 2018.  Given this, the Company overpaid more than $9.1 million in total for repurchases of its own stock between September 24, 2018 and October 28, 2018.

110.    In the aggregate, the Company overpaid by a total amount of approximately $404.3 million for repurchases of its own stock while the Individual Defendants made false and misleading statements and omissions.

**DAMAGES TO NVIDIA**

111.    As a result of the Individual Defendants' wrongful conduct, NVIDIA disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have greatly harmed NVIDIA's credibility. NVIDIA has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.  NVIDIA has already lost, and will continue to lose, many millions of dollars.

112.    Furthermore, aside from ruining the Company's reputation for honesty, integrity, and aptitude, the Individual Defendants have exposed the Company to very expensive legal costs to defend, investigate, and pay judgment or settlement in the Securities Class Action.

113.    Further losses include, but are not limited to, approximately $404.3 million that the Company overpaid, at the direction of the Individual Defendants, for the Company's repurchases of its own stock at artificially inflated prices.

114.    Moreover, these actions have irreparably damaged NVIDIA's corporate image and goodwill.  For at least the foreseeable future, NVIDIA will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that NVIDIA's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## PLAINTIFF'S DEMAND AND DERIVATIVE ALLEGATIONS

115.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

116.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

117.    Plaintiff is an owner of NVIDIA common stock and was an owner of NVIDIA common stock at all times relevant hereto.

118.    Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

119.    As a result of the facts set forth herein, Plaintiff has not made any demand on the NVIDIA Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

120.    At the time this action was commenced, the Board consisted of the following eleven Individual Defendants: defendants Huang, Burgess, Coxe, Drell, Gaither, Hudson, Jones, McCaffery, Perry, Seawell, and Stevens (collectively, the "Director Defendants").  Plaintiff needs

only to allege demand futility as to six of the eleven Directors Defendants that were on the Board at the time that the action was commenced.

### DEMAND IS FUTILE AS TO ALL DIRECTOR DEFENDANTS BECAUSE THEY ALL FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY

121.    The Director Defendants face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the time of the false and misleading statements referenced above, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate.

122.    Moreover, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, the Director Defendants knowingly and/or with reckless disregard reviewed, authorized and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of NVIDIA.

123.    The Director Defendants' making or authorization of these false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of fiduciary duties and have resulted in the Director Defendants facing a substantial likelihood of liability.  If the Director Defendants were to bring a suit on behalf of NVIDIA to

recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason, demand is futile and therefore excused.

### DEMAND IS EXCUSED AS TO DEFENDANTS HUANG, COXE, DRELL, GAITHER, HUDSON, JONES, PERRY, SEAWALL AND STEVENS BECAUSE THEY FINANCIALLY BENEFITED FROM THE FALSE AND MISLEADING STATEMENTS AND, THUS, ARE NOT DISINTERESTED

124.    As noted above, Huang, Coxe, Drell, Gaither, Hudson, Jones, Perry, Seawell and Stevens personally benefited from the materially false and misleading statements made by the Individual Defendants by having an opportunity to sell shares of NVIDIA stock at artificially inflated prices, a benefit not shared by NVIDIA's public stockholders.  Accordingly, demand is futile as to Huang, Coxe, Drell, Gaither, Hudson, Jones, Perry, Seawell and Stevens.

### DEMAND IS EXCUSED AS TO DEFENDANTS HUDSON, MCCAFFREY, PERRY AND STEVENS BECAUSE AS MEMBERS OF THE AUDIT COMMITTEE THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY

125.    As members of the Audit Committee during the Relevant Period, defendants Hudson, McCaffrey, Perry and Stevens participated in and knowingly approved NVIDIA's filing of false financial statements and allowed the Individual Defendants to repeatedly make other false and misleading statements to the investing public.  More specifically, as members of the Audit Committee, Hudson, McCaffrey, Perry and Stevens were obligated to oversee and monitor (a) the integrity of the Company's financial statements, and (b) the Company's compliance with legal and regulatory requirements.  Instead, Hudson, McCaffrey, Perry and Stevens, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls and compliance with legal and regulatory requirements, as required by the Charter.  For this reason, demand is futile as to Hudson, McCaffrey, Perry and Stevens.

### MANY BOARD MEMBERS ARE NOT INDEPENDENT OF EACH OTHER BECAUSE OF LONGSTANDING PERSONAL, FINANCIAL, OR PROFESSIONAL CONNECTIONS

126.    Among others, at least Defendants Burgess, Coxe, Drell, Gaither, Huang, McCaffery, and Seawell are not independent of each other because of longstanding personal, financial, or professional connections that render them unable to exercise independent judgment.

127.    Defendants Coxe and Gaither have long served as managing directors of Sutter Hill Ventures, a technology-focused investment firm. Defendant Burgess has worked alongside a prominent Sutter Hill Ventures partner.

128.    Sutter Hill Ventures has donated substantial sums of money to Stanford University, where Defendant Drell is currently Provost and has served on the faculty since 2002.

129.    Defendant Huang has donated substantial sums of money to Stanford University, including a $30 million gift to Stanford's engineering school.

130.    Defendants Gaither, McCaffery, and Seawell have also served on various boards and have led various institutions at Stanford University.

131.    As a result of these deep ties, these Defendants are not independent of one other and, therefore, are incapable of considering a demand on an impartial basis.

### ADDITIONAL REASONS THAT DEMAND IS FUTILE ON DEFENDANT HUANG

132.    Additional reasons that demand is futile on Defendant Huang follow. Defendant Huang is the co-founder of the Company, has served as the Company's President and CEO since its inception, and is a member of the Board.  NVIDIA admits that Defendant Huang is a non-independent member of the Board.  The Company provides Huang with his primary occupation and substantial compensation, including $12,993,532 during the fiscal year ended January 28, 2018.

133.    Defendant Huang conducted minimal, if any, oversight of the Company's engagement in the Company's scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme as well as his duties to protect corporate assets.  Defendant Huang signed, and therefore personally made false and misleading statements in, the 2018 10-K.  Defendant Huang's insider sale before the fraud was exposed, yielding at least $18.2 million in proceeds, demonstrates his motive in facilitating and participating in the fraud.

134.    Defendant Huang is also incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Action.

### ADDITIONAL REASONS THAT DEMAND IS FUTILE ON DEFENDANT BURGESS

135.    Defendant Burgess has received substantial compensation from the Company, including $359,066 during the 2018 fiscal year and $312,977 during the 2019 fiscal year. Defendant Burgess conducted minimal, if any, oversight of the Company's engagement in the Company scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme as well as his duties to protect corporate assets.  Finally, Defendant Burgess signed, and therefore personally made false and misleading statements in, the 2018 10-K.

### ADDITIONAL REASONS THAT DEMAND IS FUTILE ON DEFENDANT COXE

136.    Defendant Coxe has received substantial compensation from the Company, including $359,066 during the 2018 fiscal year and $312,977 during the 2019 fiscal year. Defendant Coxe conducted minimal, if any, oversight of the Company's engagement in the Company scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme as well as his duties to protect

corporate assets.  Defendant Coxe signed, and therefore personally made false and misleading statements in, the 2018 10-K.

### ADDITIONAL REASONS THAT DEMAND IS FUTILE ON DEFENDANT DRELL

137.   Defendant Drell has received substantial compensation from the Company, including $359,066 during the 2018 fiscal year and $312,977 during the 2019 fiscal year. Defendant Drell conducted minimal, if any, oversight of the Company's engagement in the Company scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme as well as her duties to protect corporate assets.  Defendant Drell signed, and therefore personally made false and misleading statements in, the 2018 10-K.

### ADDITIONAL REASONS THAT DEMAND IS FUTILE ON DEFENDANT GAITHER

138.   Defendant Gaither has received substantial compensation from the Company, including $359,066 during the 2018 fiscal year and $312,977 during the 2019 fiscal year. Defendant Gaither conducted minimal, if any, oversight of the Company's engagement in the Company scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme as well as his duties to protect corporate assets.  Defendant Gaither signed, and therefore personally made false and misleading statements in, the 2018 10-K.

### ADDITIONAL REASONS THAT DEMAND IS FUTILE ON DEFENDANT HUDSON

139.   Defendant Hudson has received substantial compensation from the Company, including $359,066 during the 2018 fiscal year and $312,977 during the 2019 fiscal year. Defendant Hudson conducted minimal, if any, oversight of the Company's engagement in the Company scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme as well as her duties to protect

corporate assets.  Defendant Hudson signed, and therefore personally made false and misleading statements in, the 2018 10-K.

### ADDITIONAL REASONS THAT DEMAND IS FUTILE ON DEFENDANT JONES

140.  Defendant Jones has received substantial compensation from the Company, including $359,066 during the 2018 fiscal year and $312,977 during the 2019 fiscal year. Defendant Jones conducted minimal, if any, oversight of the Company's engagement in the Company scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme as well as his duties to protect corporate assets.  Defendant Jones signed, and therefore personally made false and misleading statements in, the 2018 10-K.

### ADDITIONAL REASONS THAT DEMAND IS FUTILE ON DEFENDANT MCCAFFREY

141.  Defendant McCaffery has received substantial compensation from the Company, including $359,066 during the 2018 fiscal year and $312,977 during the 2019 fiscal year. Defendant McCaffery conducted minimal, if any, oversight of the Company's engagement in the Company scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme as well as his duties to protect corporate assets.   Defendant McCaffery signed, and therefore personally made false and misleading statements in, the 2018 10-K.

### ADDITIONAL REASONS THAT DEMAND IS FUTILE ON DEFENDANT PERRY

142.  Defendant Perry has received substantial compensation from the Company, including $359,066 during the 2018 fiscal year and $312,977 during the 2019 fiscal year. Defendant Perry conducted minimal, if any, oversight of the Company's engagement in the Company scheme to make false and misleading statements, consciously disregarded his duties to

monitor such controls over reporting and engagement in the scheme as well as his duties to protect corporate assets.  Defendant Perry signed, and therefore personally made false and misleading statements in, the 2018 10-K.

### ADDITIONAL REASONS THAT DEMAND IS FUTILE ON DEFENDANT SEAWELL

143.    Defendant Seawell has received substantial compensation from the Company, including $359,066 during the 2018 fiscal year and $312,977 during the 2019 fiscal year. Defendant Seawell conducted minimal, if any, oversight of the Company's engagement in the Company scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme as well as his duties to protect corporate assets.  Defendant Seawell signed, and therefore personally made false and misleading statements in, the 2018 10-K.

### ADDITIONAL REASONS THAT DEMAND IS FUTILE ON DEFENDANT STEVENS

144.    Defendant Stevens has received substantial compensation from the Company, including $359,066 during the 2018 fiscal year and $312,977 during the 2019 fiscal year. Defendant Stevens conducted minimal, if any, oversight of the Company's engagement in the Company scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme as well as his duties to protect corporate assets.  Defendant Stevens signed, and therefore personally made false and misleading statements in, the 2018 10-K.

## CAUSES OF ACTION

### FIRST CLAIM

#### AGAINST ALL THE DIRECTOR DEFENDANTS FOR VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT

145.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

146.    For purposes of this claim, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on negligence.

147.    SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

148.    The 2018 Proxy Statement contained misstatements of material facts and omitted material facts required to be stated in order to make the statements contained therein not misleading.

149.    Defendants Huang, Burgess, Coxe, Drell, Gaither, Hudson, Jones, McCaffery, Perry, Seawell, and Stevens are named in this count, jointly and severally, solicited and/or permitted use of their names in solicitations contained in the 2018 Proxy Statement.

150.    NVIDIA, at the direction of Defendants Huang, Burgess, Coxe, Drell, Gaither, Hudson, Jones, McCaffery, Perry, Seawell, and Stevens issued the 2018 Proxy Statement.

151.    The 2018 Proxy Statement misstated or failed to disclose that:  (1) the Individual Defendants were operating in violation of the Company's Code of Conduct and Financial Team Code; (2) NVIDIA's GPU sales growth was significantly affected by the demand for GPUs for use in cryptocurrency related activities; (3) the Company had not mastered its inventory channel; (4) the Company was unable to adapt to the volatility of the cryptocurrency market; (5) while the price of cryptocurrencies fell, the Company continued to inject mid-range GPUs into the inventory channel, disguising stagnating cryptomining-related growth; (6) the increased supply of midrange GPUs to the inventory channel would foreseeably lead to 3 months of oversupply in the channel; (7) the Company failed to maintain internal controls; and (8) that, as a result of the foregoing, the Individual Defendants' statements about NVIDIA's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

152.    In the exercise of reasonable care, Defendants Huang, Burgess, Coxe, Drell, Gaither, Hudson, Jones, McCaffery, Perry, Seawell, and Stevens should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2018 Proxy Statement were materially false and misleading.

153.    Defendants Huang, Burgess, Coxe, Drell, Gaither, Hudson, Jones, McCaffery, Perry, Seawell, and Stevens misled or deceived NVIDIA's stockholders by making misleading statements that were an essential link in the matters set forth in the 2018 Proxy Statement for which stockholder approval was sought.

154.    The misleading information contained in the 2018 Proxy Statement was material to NVIDIA's stockholders in determining whether or not to approve the matters set forth in the 2018 Proxy Statement for which stockholder approval was sought.

155.    Because of the false and misleading statements in the 2018 Proxy Statement, NVIDIA's shareholders voted to approve the matters set forth in the 2018 Proxy Statement for which stockholder approval was sought.

156.    This claim is brought within the applicable statute of limitations.

157.    Plaintiff, on behalf of NVIDIA, thereby seek relief for damages inflicted upon the Company as a result of the false and misleading statements in the 2018 Proxy Statement.

## SECOND CLAIM

### AGAINST ALL THE INDIVIDUAL DEFENDANTS FOR VIOLATION OF SECTION 10(B) AND RULE 10B-5 OF THE EXCHANGE ACT

158.    Plaintiff incorporates by reference and realleges all preceding and subsequent paragraphs as if fully set forth herein.

159.    During the Relevant Period, in connection with NVIDIA's repurchases of NVIDIA shares, the Individual Defendants disseminated or approved false or misleading statements about NVIDIA, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud.  Those false or misleading statements and the Individual Defendants' course of conduct were designed to artificially inflate the price of the Company's common stock.

160.    At the same time that the price of the Company's common stock was inflated due to the false or misleading statements made by the Individual Defendants, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at prices that were artificially inflated due to the Individual Defendants' false or misleading statements.  The Individual Defendants engaged in a scheme to defraud NVIDIA by causing the Company to purchase over $1.1 billion in shares of NVIDIA stock at artificially inflated prices.

161.    The Individual Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon NVIDIA in connection with the Company's purchases of NVIDIA stock during the Relevant Period.

162.    The Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of NVIDIA stock, which were intended to, and did, (a) deceive NVIDIA. Throughout the Relevant Period, the Individual Defendants were in possession of material, adverse non-public information regarding the Company's reliance on the cryptocurrency market.

163.    The Individual Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made during the Relevant Period, as alleged above.

164.    As described above, the Individual Defendants acted with scienter throughout the Relevant Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The misstatements and omissions of material facts set forth in this Complaint

were either known to the Individual Defendants or were so obvious that the Individual Defendants should have been aware of them.  Throughout the Relevant Period, the Individual Defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

165.    The Individual Defendants' false or misleading statements and omissions were made in connection with the purchase or sale of the Company's stock.

166.    As a result of the Individual Defendants' misconduct, NVIDIA has and will suffer damages in that it paid artificially inflated prices for NVIDIA common stock purchased as part of the repurchase program and suffered losses when the previously undisclosed facts relating to the excess channel inventory of GPUs were disclosed in November 2018.  NVIDIA would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by the Individual Defendants' false or misleading statements.

167.    As a direct and proximate result of the Individual Defendants' wrongful conduct, the Company suffered damages in connection with its purchases of NVIDIA stock during the Relevant Period.  By reason of such conduct, the Individual Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

168.    Plaintiff brought this claim within two years of his discovery of the facts constituting the violation and within five years of the violation.

### THIRD CLAIM

**AGAINST ALL THE INSIDER SELLING DEFENDANTS FOR VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT**

169.    Plaintiff incorporates by reference and realleges all preceding and subsequent paragraphs as if fully set forth herein.

170.     The Insider Selling Defendants, by reason of their relationship with the Company as officers and directors of the Company, had access, directly or indirectly, to material information about the Company not available to the public.

171.     The Insider Selling Defendants knowingly traded on this material, non-public information about the Company.

172.     The Insider Selling Defendants sold NVIDIA securities with actual knowledge that the value of these securities was inflated as a result of the Individual Defendants' false and misleading statements and other fraudulent activities detailed in this Complaint.

173.     As part of NVIDIA's publicly disclosed share repurchase program, the Company purchased approximately 4.8 million shares of its common stock throughout the Relevant Period. NVIDIA was a contemporaneous purchaser of NVIDIA's securities, pursuant to Section 20A of the Exchange Act, when the Insider Selling Defendants sold NVIDIA securities, as set forth in the charts in ¶¶ 22, 24, 27, 29, 31, 33, 35, 38, 40, 42 above.

174.     As a contemporaneous purchaser, NVIDIA was damaged by the actions of the Insider Selling Defendants, as alleged in this Complaint, in that (i) in reliance on the integrity of the market, the Company paid artificially inflated prices as a result of the violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5; and (ii) the Company would not have purchased the securities at the prices it paid, or at all, had it been aware that the market prices had been artificially inflated by Individual Defendants' false or misleading statements.  At the time of the purchase of the securities by the Company, the fair and true market value of the securities was substantially less than the price paid by the Company.

## FOURTH CLAIM

### AGAINST ALL THE INDIVIDUAL DEFENDANTS FOR
### BREACH OF FIDUCIARY DUTY

175.    Plaintiff incorporates by reference and realleges all preceding and subsequent paragraphs as if fully set forth herein.

176.    The Individual Defendants owed and owe NVIDIA fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe NVIDIA the highest obligation of good faith, fair dealing, loyalty and due care.

177.    Each of the Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

178.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue false and misleading statements that improperly misrepresented the financial condition and business prospects of the Company, as alleged herein.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

179.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, NVIDIA has sustained significant and actual damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

180.    Plaintiff, on behalf of NVIDIA, has no adequate remedy at law.

## FIFTH CLAIM

### AGAINST ALL THE INDIVIDUAL DEFENDANTS FOR
### UNJUST ENRICHMENT

181.    Plaintiff incorporates by reference and realleges all preceding and subsequent paragraphs as if fully set forth herein.

182.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of NVIDIA in the form of salaries, bonuses, and other forms of compensation.

## SIXTH CLAIM

### AGAINST DEFENDANTS HUANG, COXE, DRELL, GAITHER, HUDSON, JONES, PERRY, SEAWELL AND STEVENS FOR INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION

183.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

184.    At the time each of the Insider Selling Defendants sold his or her NVIDIA stock, he or she knew the material, non-public information described above, and sold NVIDIA stock on the basis of such information.

185.    The information described above was proprietary, non-public information concerning the Company's business operations, financial condition, and growth prospects.  It was a proprietary asset belonging to the Company, which each of the Insider Selling Defendants misappropriated to his or her own benefit when he or she sold personal holdings in NVIDIA stock. Each of the Insider Selling Defendants knew that this information was not intended to be available to the public.  Had such information been generally available to the public, it would have significantly reduced the market price of NVIDIA stock.

186.    The Insider Selling Defendants' sale of stock while in possession and control of this material, adverse, non-public information was a breach of his or her fiduciary duties of loyalty and good faith.  Each of the Insider Selling Defendants is therefore liable to NVIDIA for insider trading.

187.    Since the use of the Company's proprietary information for personal gain constituted a breach of the fiduciary duties of the Insider Selling Defendants, the Company is

entitled to the imposition of a constructive trust on any profits such Insider Selling Defendants obtained thereby.

188.    Plaintiff, on behalf of NVIDIA, has no adequate remedy at law.

## SEVENTH CLAIM

### AGAINST ALL THE INDIVIDUAL DEFENDANTS FOR
### WASTE OF CORPORATE ASSETS

189.    Plaintiff incorporates by reference and realleges all preceding and subsequent paragraphs as if fully set forth herein.

190.    As noted above, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

191.    As a result of this waste of corporate assets, the Company has been damaged and the Individual Defendants are each liable to the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of NVIDIA and that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

C.    Ordering defendants Huang, Kress, Coxe, Drell, Gaither, Hudson, Jones, Perry, Seawell, and Stevens, to disgorge the profits obtained as a result of their sale of NVIDIA stock while in possession of insider information as described herein;

D.      Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

### **<u>JURY DEMAND</u>**

Plaintiff hereby demand a trial by jury.

Dated:  September 24, 2019

Respectfully Submitted,

**COOCH AND TAYLOR, P.A.**

*/s/ Blake A. Bennett*
Blake A. Bennett (#5133)
The Nemours Building
1007 N. Orange Street, Suite 1120
Wilmington, DE 19801
Telephone: (302) 984-3800
Email: bbennett@coochtaylor.com

*Attorney for Plaintiff*

**OF COUNSEL**

**BRAGAR EAGEL & SQUIRE, P.C.**
W. Scott Holleman
Marion C. Passmore
Garam Choe
Alexandra B. Raymond
885 Third Avenue, Suite 3040
New York, New York 10022
Telephone: (646) 860-9449

**HYNES & HERNANDEZ, LLC**
Michael J. Hynes
Ligaya T. Hernandez
101 Lindenwood Drive, Suite 225
Malvern, Pennsylvania 19355
Telephone: (484) 875-3116

*Attorneys for Plaintiff*